

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-16-2005

# Harrison Aire Inc v. Aerostar Intl Inc

Precedential or Non-Precedential: Precedential

Docket No. 04-2904

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Harrison Aire Inc v. Aerostar Intl Inc" (2005). *2005 Decisions.* Paper 469.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/469

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 04-2904 & 04-3052

———————

HARRISON AIRE, INC.,
                    Appellant in No. 04-2904

v.

AEROSTAR INTERNATIONAL, INC.;
RAVEN INDUSTRIES, INC.,
                    Appellants in No. 04-3052

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 02-cv-01258
(Honorable Michael M. Baylson)

———————

Argued March 7, 2005

Before: SCIRICA, *Chief Judge*,
ROTH and BECKER, *Circuit Judges*

(Filed  September 16, 2005)

JOHN K. WESTON, ESQUIRE (ARGUED)
JULIE C. PARKER, ESQUIRE
Sacks, Weston, Smolinsky, Albert & Luber
510 Walnut Street, Suite 400
Philadelphia, Pennsylvania 19106
  Attorneys for Appellant/Cross-Appellee,
  Harrison Aire, Inc.


JEFFREY A. OSHIN, ESQUIRE (ARGUED)
Hardin, Kundla, McKeon, Poletto & Polifroni
673 Morris Avenue
P.O. Box 730
Springfield, New Jersey 07081
  Attorney for Appellees/Cross-Appellants,
  Aerostar International, Inc. and Raven Industries, Inc.

———————————

OPINION OF THE COURT

———————————

SCIRICA, *Chief Judge*.

In this antitrust action, we address allegations of unlawful monopolization and tying in the aftermarket for replacement hot air balloon fabric.  The District Court granted defendants' motion for summary judgment, finding no triable issue of

2

monopoly power in the relevant product market. We will affirm.

## I.

Harrison Aire, a hot air balloon ride operator, alleges antitrust violations by Raven Industries and its balloon-manufacturing subsidiary, Aerostar International. Consistent with our standard of review on summary judgment, we recount the facts in the light most favorable to the non-moving party, appellant Harrison Aire.

Terry Harrison, the sole owner and proprietor of Harrison Aire, is an FAA-licensed pilot and aircraft mechanic. After a twenty-three year career at Eastern Airlines, he retired in 1973 to launch the Harrison Aire enterprise from an airstrip in central New Jersey. The company owns and operates several hot air balloons which it charters for recreational day trips over the New Jersey countryside. Since the mid 1990s, the business has suffered cash-flow problems. Harrison Aire blames its losses, in part, on the prohibitive expense of replacement balloon fabric, which it contends is a result of Raven/Aerostar's monopolization of the relevant balloon fabric aftermarket.

Raven Industries is a diversified manufacturing company based in Sioux Falls, South Dakota. From the 1970s through 1986, it manufactured hot air balloons and replacement balloon fabric. In 1986, Raven formed Aerostar International as a wholly-owned subsidiary to take over its balloon business. Aerostar International manufactures and sells hot air balloons in

a market of at least five competitors and also produces and sells replacement balloon fabric.

Hot air balloons are regulated from cradle to grave by the Federal Aviation Administration. The FAA certifies balloon design and manufacturing standards, 14 C.F.R. § 21.11-53, requires the manufacturer to provide a maintenance manual along with its aircraft, *id.* § 21.50, reviews the content of the manual, *id.* § 31.82, and certifies replacement part designs for airworthiness, *id.* 21.303. The FAA's "maintenance manual" and "replacement part" regulations bear on this appeal.

Balloon manufacturers are required to provide their customers with a balloon maintenance manual, known as an "ICA" (Instructions for Continued Airworthiness), which sets forth recommended and required maintenance procedures. The manual is in two parts. The first, known as the "FAA accepted" section, establishes manufacturer-recommended but not FAA-required protocols. The second, known as the "Airworthiness Limitation Section," establishes FAA requirements affecting flight safety.

Regulations also govern the manufacture and sale of replacement balloon parts, including replacement fabric. All replacement parts must be "of such a quality" that the repaired balloon is "at least equal to its original or properly altered condition." 14 C.F.R. § 43.13(b). The FAA authorizes third-party manufacturers to sell aftermarket parts, including replacement fabric, provided they first obtain FAA certification

4

that the product is equal to or better than the original. *Id.* § 21.303.

Replacement fabric extends the service life of a hot air balloon. The top half of the balloon "envelope"—the material encapsulating the hot air—tends to deteriorate more rapidly than the bottom half. By replacing top-half fabric after 300 to 500 hours of use, balloon owners are able to extend the aircraft's service life for an additional 200 to 300 hours. Generally, it is more economical to replace fabric in this manner than to purchase an entirely new envelope. Harrison Aire followed this practice in maintaining its fleet of Raven/Aerostar balloons.

Harrison Aire purchased its first Raven balloon in 1978. The parties' dispute over fabric replacement began shortly thereafter. According to Terry Harrison, Raven advised him that he could not purchase replacement fabric from other manufacturers because installation of third-party fabric would render the balloon unairworthy. In 1982, Raven revised its balloon maintenance manuals to make this policy explicit, warning Raven balloon owners that "only fabric which has been tested and approved according to Raven factory standards may be used for repair of Raven envelopes. Failure to comply with this requirement constitutes a departure from type design and renders the balloon unairworthy." This language appeared in the FAA-approved, rather than the FAA-required, section of Raven maintenance manuals. Reading the manual in the light most favorable to Harrison Aire, it warned that only Raven-brand fabric should be used in Raven balloons.

Terry Harrison repeatedly complained to Raven, believing its insertion of the "warning" into the balloon manual transformed the fabric policy into an FAA requirement that legally barred him from obtaining cheaper fabric elsewhere. On several occasions between 1982 and 1986, Harrison confronted Raven representatives about the manual language, but was told that no other aftermarket product was equal to or better than Raven fabric, and that only Raven fabric was consistent with airworthiness standards. Harrison understood this as a representation that he was required to purchase Raven fabric in order to comply with the FAA's "equal to or better" standard for replacement parts. Harrison Aire contends that from 1978 to 1986, Raven misled the company into believing the purchase of Raven fabric was mandated by law, when in fact it was merely recommended by the manufacturer.

In February 1986, Raven Industries formed Aerostar International to take over its hot air balloon business. Aerostar continued Raven's balloon operation essentially uninterrupted, and became the new focus of Harrison Aire's campaign to purchase fabric from third-party sources. Shortly after Aerostar was incorporated, Harrison registered several complaints with Aerostar about "being forced" to use Raven/Aerostar fabric. Nevertheless, despite its understanding that Aerostar balloons required Aerostar replacement fabric, Harrison Aire purchased a "big ride" Aerostar balloon in 1986 that is the subject of this litigation.

By 1995, Harrison Aire's "big ride" Aerostar balloon required a major fabric replacement. By this time, two other manufacturers had received FAA approval to produce aftermarket fabric for Aerostar balloons. *See* 14 C.F.R. § 21.303 (authorizing the manufacture of replacement balloon parts upon receipt of a "Parts Manufacturer Approval" from the FAA). Harrison investigated one of the approved sellers, Custom Nine Designs, but decided against purchasing their fabric because of concerns that it lacked quality. Harrison never contacted the other approved supplier, Head Balloons. Viewing Aerostar-brand fabric as its only option and as prohibitively expensive, Harrison Aire retired the "big ride" balloon in 1996 rather than repairing it.

Harrison eventually realized that installation of third-party fabric was legally permissible. In July 2000, following an administrative proceeding between the FAA and a third-party balloon repair service, an Administrative Law Judge concluded the fabric "warning" found in Aerostar's maintenance manual was not legally binding. *In re Braden's Balloons Aloft, Inc.*, FAA No. CP99SWO037 (July 26, 2000). Harrison contends the *Braden's* decision provided him notice, for the first time, that his company was not required to purchase Aerostar-brand fabric.

In March 2002, Harrison Aire filed suit in federal court, alleging, *inter alia*, antitrust injury arising from Raven/Aerostar's monopolization of the aftermarket for replacement Aerostar balloon fabric and from the unlawful tying of Aerostar-brand fabric to Aerostar balloons. But for

7

Raven/Aerostar's allegedly misleading and exclusionary aftermarket fabric policy, Harrison Aire contends that its "big ride" balloon would have been repaired in 1996 and still operational. The District Court granted summary judgment to defendants, holding they lacked sufficient market power in the relevant product market. *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 316 F. Supp. 2d 186 (E.D. Pa. 2004).[1]

## II.

The District Court had jurisdiction under the federal antitrust laws, 15 U.S.C. § 15 (providing cause of action and treble damage remedy), and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. Our summary judgment standard of review is plenary. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (drawing all reasonable inferences in favor of the non-moving party).

---

[1]Harrison Aire's complaint included both federal antitrust counts and supplemental claims under state law. On May 3, 2004, the District Court granted Raven/Aerostar's motion for summary judgment in part, dismissing the antitrust counts and ordering trial on the state law counts. The parties then stipulated to final judgment with prejudice against Harrison Aire on the surviving claims, in order to facilitate an immediate appeal on the antitrust issues. Accordingly, the state law claims are not at issue and our analysis is confined to the federal antitrust claims.

Significantly, however, "antitrust law limits the range of permissible inferences" that can be drawn "from ambiguous evidence." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). To avoid deterring pro-competitive behavior, "certain inferences may not be drawn from circumstantial evidence in an antitrust case." *In re Flat Glass Antitrust Litig.*, 385 F.3d at 357 (quoting *Intervest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003)).

To survive a motion for summary judgment, an antitrust plaintiff must produce economically plausible evidence supporting the elements of its claim. *See Matsushita*, 475 U.S. at 588; *Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737, 748-50 (3d Cir. 1996) (applying *Matsushita* in section 2 action); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1140 (E.D. Pa. 1981) ("It is now settled that summary judgment is appropriate in those antitrust cases where plaintiffs, after having engaged in extensive discovery, fail to produce 'significant probative evidence' in support of the allegations in their complaint.") (citations omitted). "If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992).

9

**III.**

We begin with Harrison Aire's monopolization claim. Under section 2 of the Sherman Act, monopolization consists of: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *see also* 15 U.S.C. § 2; *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc) (reviewing section 2 case law and explaining the "willful acquisition or maintenance" element).

Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). More precisely, it is "the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable." *Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1319 (7th Cir. 1991); *see also United States v. Dentsply Int'l Inc.*, 399 F.3d 181, 189 (3d Cir. 2005) (emphasizing a monopolist's power "to *maintain* market share") (emphasis in original) (quoting *United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990)).

Monopoly power can be demonstrated with either direct evidence of supracompetitive pricing and high barriers to entry, *see Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th

10

Cir. 1995), or with structural evidence of a monopolized market. Because "direct proof is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power." *United States v. Microsoft*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (citations omitted).

**A.**

Harrison Aire contends Aerostar charged supracompetitive prices for its fabric, based on the uncontested fact that Aerostar's fabric is more expensive than that of its aftermarket competitors. But this alone does not support a reasonable inference of monopoly power. Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product. *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) ("Generally you must pay more for higher quality."). Therefore, "when dealing with a heterogeneous product or service . . . a reasonable finder of fact cannot infer monopoly power just from higher prices." *Id*. at 1411-12.

Here, the record is clear that balloon fabric is a heterogeneous product. Fabric is sold in various weaves and grades, of differing strength and durability. The record demonstrates that Aerostar fabric is of comparatively high quality. Although Harrison considered purchasing fabric from one of Aerostar's aftermarket competitors, Custom Nine Designs, he rejected the product because Custom Nine "didn't

11

prove to me that it wasn't a bogus part." Furthermore, Custom Nine's president acknowledged that Aerostar's "diamond weave" fabric was a superior aftermarket product to his own. Because it is undisputed that balloon fabric, and particularly Aerostar fabric, is differentiated by composition and quality, Aerostar's comparatively high price does not, by itself, support a reasonable inference of monopoly power.

**B.**

Turning to Harrison Aire's circumstantial evidence of monopoly power, we note the structural indicators of a monopolized market. In a typical section 2 case, monopoly power is "inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51; *see also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201-03 (3d Cir. 1992) (explaining market share analysis). Plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a relevant product market, of the alleged monopolist's dominant share of that market, and of high barriers to entry. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (market definition); *Fineman*, 980 F.2d at 201-03 (3d Cir. 1992) (market share); *Microsoft*, 253 F.3d at 82 (barriers to entry).

Additional factors are relevant in the aftermarket context. Aftermarket monopolization cases require a more comprehensive analysis, because market share data standing

12

alone is not necessarily a reliable proxy for monopoly power. *SMS Syst. Maint. Servs. Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 16 (1st Cir. 1999). Many firms supply unique and/or proprietary aftermarket parts and services for their primary market products. As a result, they "can be expected to have a very high percentage" share of the relevant aftermarket. *Id*. But high aftermarket share is not necessarily indicative of monopoly power—i.e., the power to charge and maintain a supracompetitive price—because aftermarket behavior generally is disciplined by competition in the primary product market. If the primary market is competitive, a firm exploiting its aftermarket customers ordinarily is engaged in a short-run game—for when buyers evaluate the "lifecycle" cost of the product, the cost of the product over its full service life, they will shop elsewhere. Eventually, the aftermarket "monopolist" lacks customers to exploit. *See Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 236 (7th Cir. 1988) (Posner, J., dissenting) (describing the exploitation of aftermarket customers as a "suicidal" business practice); *SMS*, 188 F.3d at 16 ("firms concerned with the long term cannot afford to bite the hands that feed them").

This portrayal is conventional antitrust theory. *See* 2A Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 564b, at 322-28 (2d ed. 2002). But as explained in *Kodak*, it "may not accurately explain the behavior of the primary and derivative markets for complex durable goods" where "significant information and switching costs" sever the usual link between

13

the primary market and the aftermarket. 504 U.S. at 473. Information costs are barriers that prevent primary market consumers from evaluating the lifecycle costs of a product. *Id.* at 473-74. For primary market competition to discipline aftermarket behavior, consumers require information on, among other things, the expected cost, quality and availability of aftermarket products such as parts and service. Perfect information is not required for the primary market to check the aftermarket. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 (1984) (holding, in tying case, that imperfect information does not necessarily "generate the kind of monopoly power that justifies condemnation"); *SMS*, 188 F.3d at 19 n.3 ("perfect information about the aftermarket is not required"). But sometimes lifecycle pricing information is particularly difficult or impossible for primary market customers to acquire, as in the case of a unilateral change in aftermarket policy targeting "locked in" customers. *Kodak* involved this type of market failure. *See Queen City Pizza*, 124 F.3d at 440 ("The *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies.")

*Kodak* involved a primary market for photocopiers and an aftermarket for Kodak parts and service. The primary market was competitive. But Kodak controlled nearly 100% of the parts aftermarket, and 80% to 95% of the service market. 504 U.S. at 480. Historically, Kodak's customers had been able to obtain copier repair service from independent service organizations that charged "substantially" less than Kodak. 504

14

U.S. at 457. Later, however, after customers were locked in to Kodak copiers, Kodak changed its aftermarket policy to sell replacement parts only to those customers who also purchased Kodak service or who repaired their own machines. *Id.* at 458. This policy change led to higher aftermarket prices. *Id.* at 465. In other words, Kodak used its power in the replacement parts market to "squeeze the independent service providers out of the repair market and to force copier purchasers to obtain service directly from Kodak, at higher cost." *Queen City Pizza*, 124 F.3d at 440.

The Supreme Court held the independent service organizations' tying and monopolization claims against Kodak could not be dismissed on summary judgment following truncated discovery. *Kodak*, 504 U.S. at 486. On the key question of monopoly power in the parts and services aftermarket, the Court cited evidence of (1) supracompetitive pricing, *id.* at 469; (2) Kodak's dominant share of the relevant aftermarket, *id.* at 480; (3) significant information costs that prevented lifecycle pricing by primary market customers, *id.* at 475; and (4) high "switching costs" that served to "lock in" Kodak's aftermarket customers, *id.* at 477. Together, this evidence supported a reasonable inference of monopoly power in the relevant aftermarket, precluding summary judgment**.**

In broad terms, *Kodak* stands for the proposition that market reality is the touchstone of antitrust analysis. Where the plaintiff comes forward with concrete evidence of a monopolized market, the defendant "bears a substantial burden

15

in showing that it is entitled to summary judgment." 504 U.S. at 469. On the more specific issue of aftermarket monopolization, *Kodak* held that primary market competition does not necessarily preclude monopoly power in the relevant aftermarket where a unilateral policy change targets "locked-in" customers.

But *Kodak* does not transform every firm with a dominant share of the relevant aftermarket into a monopolist. To create a triable question of aftermarket monopoly power, the plaintiff must produce "hard evidence dissociating the competitive situation in the aftermarket from activities occurring in the primary market." *SMS*, 188 F.3d at 17 (1st Cir. 1999).

In considering the effect of primary market competition on aftermarket behavior, we address at the outset the relevant market definition. Some courts have viewed the primary and aftermarket as comprising a single relevant product market. *See id.*; *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997). But this may not always be the case. Relevant market definition is a function of reasonably available product substitutes. *Du Pont*, 351 U.S. at 395 (1956). Products are included in a single relevant market when they "have the ability—actual or potential—to take significant amounts of business away from each other." *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994) (quoting *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978)); *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986). Under this framework, we

16

believe the relevant market here is that for replacement fabric for Aerostar balloons. The primary balloon market is distinct from the fabric aftermarket because fabric is a complement to, not a substitute for, the primary good. Nevertheless, these complementary products are linked by consumer demand such that competition in the foremarket may discipline behavior in the aftermarket. The proper inquiry, then, focuses on the existence of monopoly power, i.e., "whether competition in the equipment market will significantly restrain power in the service and parts market." *Kodak*, 504 U.S. at 470 n.15.

One important consideration is whether a unilateral change in aftermarket policy exploits locked-in customers. *Queen City Pizza*, 124 F.3d at 440 (3d Cir. 1997); *SMS*, 188 F.3d at 19 (1st Cir. 1999); *Alcatel USA, Inc. v. DGI Tech., Inc.*, 166 F.3d 772, 783 (5th Cir. 1999); *PSI*, 104 F.3d at 820 (6th Cir. 1997). As the Court of Appeals for the Seventh Circuit has explained: "The Court did not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive lifecycle prices. The material dispute that called for a trial was whether the change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines." *Digital Equip. Corp. v. Uniq Digital Tech., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996); *accord SMS*, 188 F.3d at 17-19 (1st Cir. 1999); *PSI*, 104 F.3d at 820 (6th Cir. 1997).

17

We emphasize, however, that an "aftermarket policy change" is not the *sine qua non* of a *Kodak* claim. An aftermarket policy change is an important consideration, but only one of several relevant factors. As noted, the *Kodak* plaintiffs came forward with evidence of (1) supracompetitive pricing, (2) Kodak's dominant share of the relevant aftermarket, (3) significant information costs that prevented lifecycle pricing, and (4) high "switching costs" that served to "lock in" Kodak's aftermarket customers.

Here, in contrast, Harrison Aire has failed to meet its burden of dissociating competition in the primary market from conditions in the aftermarket. It is undisputed that the primary balloon market is competitive. And unlike the plaintiffs in *Kodak*, Harrison Aire has failed to produce evidence of supracompetitive pricing, of dominant aftermarket share, of information costs preventing lifecycle pricing, or of a change in aftermarket policy targeting locked-in customers. Together, these evidentiary failures compel summary judgment for the defendant.

Harrison Aire purchased its first Raven balloon in 1978. From that time on, Terry Harrison believed that Raven required him to use Raven-brand replacement fabric. Harrison repeatedly complained about this policy. From 1982, when Raven first published its allegedly exclusionary "warning" about third-party replacement fabric, and continuing through 1986, when Raven formed Aerostar, Terry Harrison on several occasions confronted Raven representatives about their restrictive fabric

18

policy. Similarly, immediately after Aerostar's incorporation in February, 1986, Harrison registered several complaints about "being forced" to buy Aerostar fabric. Yet knowing Raven/Aerostar's restrictive fabric policy, Harrison Aire entered the competitive primary market in 1986 to purchase the "big ride" Aerostar balloon that is the subject of this lawsuit.

The transparency of Raven/Aerostar's aftermarket fabric policy, and Harrison Aire's undisputed knowledge of it, cuts strongly against an inference of monopoly power. *SMS* is instructive on this point. Like Harrison Aire, the plaintiffs in *SMS* produced some evidence of switching costs, 188 F.3d at 20, but failed to come forward with sufficient evidence of supracompetitive pricing, *id.* at 24, and significant information barriers to lifecycle pricing, *id*. at 18-19, to survive summary judgment on the issue of monopoly power. In affirming summary judgment for the defendant, the court in *SMS* engaged in a comprehensive analysis under the relevant *Kodak* factors. In particular, *SMS* emphasized the transparency of the defendant's aftermarket policy, explaining that readily available aftermarket information allows reasonably diligent primary market customers to engage in lifecycle pricing. *Id.* at 18-19. This, in turn, checks aftermarket monopolization. *See id*. at 19 ("[T]he transparency of [defendant's] allegedly monopolistic policy represents a salient departure from the *Kodak* scenario.").

Raven/Aerostar's aftermarket policy was transparent and known to Harrison Aire at all relevant times. Neither information costs nor a unilateral change in aftermarket policy

19

prevented Harrison Aire from shopping for competitive lifecycle balloon prices when it purchased the "big ride" balloon at issue in 1986. Furthermore, after full discovery, Harrison Aire has not produced other evidence dissociating competitive conditions in the primary balloon market from conditions in the aftermarket for replacement fabric. The record here is clear that Harrison Aire got precisely the balloon and the aftermarket fabric that it bargained for in the competitive primary market.

Lacking any evidence of significant information barriers to lifecycle pricing, or any other evidence dissociating competitive conditions in the primary market and the aftermarket, summary judgment is proper on Harrison Aire's monopolization claim.

## IV.

Harrison Aire also alleges unlawful tying under section 1. The claim lacks merit. "Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir. 1992) (en banc). "The antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not." *Queen City Pizza*, 124 F.3d at 442-43 (quoting *Town Sound*, 959 F.2d at 475); *see also Microsoft*, 253 F.3d at 84. Tying requires "appreciable economic power" in the tying

20

product market. *Kodak*, 504 U.S. at 464; *Brokerage Concepts v. U.S. Healthcare, Inc.*, 140 F.3d 494, 516-17 (3d Cir. 1998).

Harrison Aire contends Raven/Aerostar unlawfully tied its hot air balloons (the tying product) to its replacement fabric (the tied product), but fails to produce any evidence of appreciable market power in the tying product market. As noted, it is undisputed that the primary market for hot air balloons is competitive. Absent this essential element, we will affirm summary judgment on the tying claim.

## V.

As an alternative holding, the District Court concluded Harrison Aire failed to properly allege antitrust injury under *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). This was error. *Brunswick* held the antitrust laws protect consumers, not competitors, and that antitrust plaintiffs must show a causal connection between the defendant's anti-competitive conduct and injury to consumers. *Id.* at 488-89. Injury to competitors does not suffice. Here, Harrison Aire is a consumer of balloon fabric, and it claims antitrust injury in the form of business losses caused by high fabric prices, which in turn allegedly were caused by Raven/Aerostar's exclusionary conduct in the relevant fabric market. This type of injury—prohibitively high consumer prices resulting from allegedly monopolistic behavior—is the type the antitrust laws are designed to redress. *See Town Sound*, 959 F.2d at 486 (3d Cir. 1992) (en banc) (explaining antitrust injury); *U.S. Gypsum*

21

*Co. v. Ind. Gas Co.*, 350 F.3d 623, 626-28 (7th Cir. 2003) (same).

The District Court concluded that "[a]ny injuries that Plaintiff suffered would have come from Defendants' misrepresentations, not from any market power, abuse of market power or other anticompetitive conduct." 316 F. Supp. 2d at 224. But these purported misrepresentations are alleged to have had an anticompetitive effect in the aftermarket—namely the exclusion of more efficient competitors. Harrison Aire alleges that Aerostar used misleading manual language, and the imprimatur of FAA acceptance, to consolidate its position in the fabric aftermarket. This, in turn, allegedly prevented Harrison and consumers like him from purchasing lower-cost fabric from Aerostar's competitors. These allegations satisfy the antitrust injury requirement.

The District Court found antitrust injury lacking because the manual "did not forbid Plaintiff from purchasing other manufacturers' fabric and that a reasonable investigation on this point by Plaintiff would have disclosed . . . that Plaintiff could buy replacement fabric from anyone who manufactured [it] to the FAA standards." *Id.* at 217. In other words, the District Court held that no injury to consumers could be shown because no jury could find that Harrison Aire reasonably relied on the manual.

It is true that further investigation by Harrison Aire *might* have revealed that Aerostar's replacement-fabric instructions

22

were not legally binding. But the record is not clear that Harrison Aire's reliance on the manual was unreasonable. Indeed, it appears that the FAA, like Harrison Aire, viewed Aerostar's manual as restricting the use of non-Aerostar fabric in Aerostar balloons. Not until the *Braden's* decision in 2000 did the FAA recognize the Aerostar manual as non-binding. Since the FAA itself interpreted Aerostar's manual as restricting the use of third-party fabric, the reasonableness of Harrison Aire's reliance on that manual presents a jury question. A jury could have found that Harrison reasonably believed that Aerostar's manuals prevented him from buying lower-priced fabric from competitors. Because this alleged exclusion of competitors, to the detriment of consumers, is the sort of harm the antitrust laws are intended to prevent, summary judgment was improper on the issue of antitrust injury. While we hold Harrison Aire's antitrust claims ultimately fail for lack of monopoly/market power in the relevant market, they are not defective for failure to allege antitrust injury.

## CONCLUSION

For the reasons set forth, we will affirm the judgment of the District Court.

23