NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 11-2999

———————

3039 B STREET ASSOCIATES, INC.,
                                        Appellant

v.

LEXINGTON INSURANCE COMPANY

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-10-cv-01740
District Judge: The Honorable Eduardo C. Robreno


Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 18, 2012

Before: SMITH and FISHER, *Circuit Judges*
and STEARNS, *District Judge**
(Filed: May 22, 2012)

———————————

*The Honorable Richard G. Stearns, United States District Judge for the United States District Court of Massachusetts, sitting by designation.

———————————

OPINION

———————————

STEARNS, *District Judge.*

Appellant 3039 B Street Associates, Inc. (B Street) seeks review of a decision of the United States District Court for the Eastern District of Pennsylvania granting summary judgment to appellee Lexington Insurance Company (Lexington) on its denial of coverage to B Street for a stolen property claim. Because the District Court correctly determined that the entrustment exclusion of the policy applied, we will affirm.

## BACKGROUND[1]

Lexington issued Commercial Property Policy Number 747856, effective June 30, 2007 to June 30, 2008 (Policy), through HWI Global Properties, Inc., an insurance purchasing group, to B Street. The Policy provided coverage for the contents of a three-story warehouse B Street owned at 3039-51 B Street in north Philadelphia. The Policy contained several loss exclusions, among them the following:

> This policy does not insure against loss or damage . . . [c]aused by . .
> . misappropriation, secretion, conversion, fraud, infidelity or any

---

[1] We recount the material facts in the light most favorable to B Street, as the non-moving party. *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 377 (3d Cir. 2005).

dishonest act or omission on the part of the insured or other party of interest, his, her or their trustees, directors, officers, employees, agents or others to whom the property may be entrusted; this exclusion does not apply to a carrier for hire, nor to acts of destruction by your employees; but theft by employees is not covered . . . .

App. at 76a.

Gianni Pignetti, B Street's President, gave Brett Gillespie, a former employee, permission to scavenge metal from the warehouse, "to clean the place up." *Id*. at 164a. Pignetti provided Gillespie with the keys to the warehouse to expedite the work. In early April of 2008, Gillespie and his crew removed metal wiring and fixtures from the warehouse, including the 66 radiators that are the focus of this dispute.

The testimony regarding Gillespie's removal of the radiators is conflicting. Drew Callahan, the warehouse's sole tenant, testified that he met a man on the loading dock who informed him "that he worked for Pignetti and was there to remove scrap metal from the warehouse." *Id*. at 249a. Callahan asked Dan Marino, a B Street partner, to notify Pignetti that workers were on the premises removing the radiators. According to Callahan, Pignetti called and told him that Gillespie "was his friend and that he had his permission to remove all copper wiring, radiators and bathroom fixtures from the building so he could make some money." *Id*. at 250a. Callahan testified that a few days later, when he saw the men removing bathroom fixtures, he called Pignetti to complain that the warehouse

3

required a working bathroom. Pignetti replied that Callahan "did not need a bathroom because [he] was just warehousing equipment." *Id*. Edgar Branch, a building maintenance worker, testified that after he observed four men taking radiators out of the warehouse, he called Dan Finnetti at B Street. *Id*. at 261a. Finnetti told him that the men "were there to clean out the building." *Id*. Branch saw the same men at the warehouse three days later while making a routine, drive-by inspection.[2]

Pignetti testified that he did not give Gillespie permission to remove the radiators, which were attached to the walls – only "the loose stuff." *Id*. at 164a. Pignetti stated that upon being informed by B Street that someone was at the warehouse removing radiators, he immediately spoke to Callahan and "told him to tell them people to stop, and I ran over there. And when I got there, nobody was there. Then I called Gillespie and said: What are you doing? And he said: I'm fucked up and I don't know."[3] *Id*.

---

[2] Branch testified that after the warehouse boiler burst in January of 2008, and there was no longer heat in the building, he stopped making daily inspections of the property. Around the time that the radiators were taken, Branch was conducting drive-by inspections of the warehouse approximately three times per week, mostly looking out for broken windows. *Id*. at 257a.

[3] The record does not explain why Pignetti did not ask Gillespie to return the radiators. Pignetti testified at his May of 2009 deposition that a few days before he had bailed Gillespie out of jail after he was arrested for "fighting." *Id*. at 165a.

On October 7, 2008, B Street filed a stolen property report with the Philadelphia police. *Id*. at 182a. On October 13, 2008, B Street filed a $160,864.64 "Notice of Loss" for the radiators with Lexington. *Id*. at 167a. B Street listed the date of the loss as April 4, 2008.

After conducting an investigation, Lexington denied coverage on September 29, 2009. As reasons for the denial, Lexington first pointed to the Policy's entrustment exclusion and Pignetti's testimony that he had "entrust[ed] the property in question to . . . Gillespie, the alleged thief." *Id*. at 339a-340a. Lexington noted the conflict between Pignetti's statement that he had only given Gillespie permission to take "the loose stuff" and Callahan's testimony that he had informed Pignetti "on more than one occasion that the . . . radiators were being removed from the Premises and that [Pignetti] told him that Gillespie was authorized to remove the items." *Id*. at 340a. Finally, Lexington cited the Policy's requirement of "immediate written notice of any loss," a condition of coverage that B Street breached by waiting more than six months to file its claim.

On March 30, 2010, B Street sued Lexington in federal court alleging claims of breach of contract and bad faith. *Id*. at 131a-139a. After discovery concluded, Lexington moved for summary judgment on several grounds, including the Policy's exclusions clause. Judge Robreno granted the motion, noting that "[a]lthough the evidentiary record presents a compelling case for both [the fraud

5

and entrustment] exclusions, . . . it is nevertheless clear that the entrusted property exclusion applies." *Id.* at 4a. Judge Robreno based his decision on Pignetti's undisputed testimony that he gave Gillespie the keys to the warehouse and provided him "with unsupervised access to the premises." *Id.* at 5a. B Street filed a timely notice of appeal on July 21, 2011.

## DISCUSSION

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1332. This Court has jurisdiction under 28 U.S.C. § 1291. We review a district court's grant of summary judgment de novo, applying "the same standard as the District Court in determining whether summary judgment was appropriate." *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Ordinarily in insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (citing *Koppers Co. v.*

*Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law)).

On appeal, B Street contends that the District Court "ignored two key undisputed facts in reaching its conclusion . . . that the radiators were part of the warehouse structure . . . therefore real property that cannot be the subject of a bailment and, therefore, could not have been entrusted to Gillespie." Appellant's Br. at 5. B Street also complains that the lower court failed to consider that its "maintenance man, Branch, was also present in the building while Gillespie was present so the warehouse clearly was not entrusted to Gillespie as there was an employee of B Street present in the building also."[4] *Id*. at 6.

Like the District Court Judge, we need go no further than the entrustment exclusion. B Street argues that "[t]he entrustment exclusion makes no sense unless it is applied only to personal property." Appellant's Reply Br. at 1. The argument is based on a synonymous reading of "entrustment" and "bailment." While a bailment is a form of entrustment, the Policy exclusion was not limited to personal

---

[4] This argument was not presented to the District Court Judge and we decline to consider it now. *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) ("It is axiomatic that 'arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review in this Court absent exceptional circumstances.'" (quoting *United States v. Petersen*, 622 F.3d 196, 202 n.4 (3d Cir. 2010))). We do note that Branch's three times per week drive-by inspections of the warehouse for broken windows would unlikely be considered to constitute a "supervisory presence."

property, nor did it make any mention of the term bailment.[5]  The cases cited by the District Court are on target.  *See Wagner v. Edemnify, LLC*, No. 4:08-cv-299, 2009 WL 5062058, at *3 (E.D. Tex. Dec. 16, 2009) (independent contractor who was given keys and unsupervised access when hired to clean up a building was "entrusted" with its contents for purposes of an insurance policy theft exclusion); *Wexler Knitting Mills v. Atl. Mut. Ins. Co.*, 555 A.2d 903, 905 (Pa. Super. Ct. 1989) (finding a theft exclusion applicable to anyone entrusted with the property by the insured).  In both cited cases, the entrustment clause is virtually identical to that in B Street's Policy.  Like the insureds in the *Wagner* and *Wexler* cases, B Street entrusted the warehouse to a third party – Gillespie – who took advantage of the opportunity to steal the building's radiators.  That the radiators were fixtures rather than chattels is a distinction that has no bearing on our interpretation of the exclusion clause. Lexington properly denied coverage in reliance on the exclusion and the District Court so held.

Consequently, we will affirm the judgment of the District Court.

---

[5] Lexington aptly notes that "[w]hile a bailment is a form of entrustment . . . the converse, that ‚an entrustment is a bailment" is not true.  This flawed reasoning is akin to asserting that because a fork is a utensil all utensils must be forks." Appellee Br. at 14.

8