*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0011p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

JAMES R. PRICE,

             *Plaintiff–Appellee,*

    *v.*

BOARD OF TRUSTEES OF THE INDIANA
LABORER'S PENSION FUND; INDIANA
LABORER'S PENSION FUND,

             *Defendants–Appellants.*

Nos. 09-3897/4204

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 07-00933—Algenon L. Marbley, District Judge.

Argued: August 6, 2010

Decided and Filed: January 12, 2011

Before: SUTTON and McKEAGUE, Circuit Judges; JONKER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** R. Gary Winters, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellants. Tony C. Merry, LAW OFFICES OF TONY C. MERRY, LLC, Columbus, Ohio, for Appellee. **ON BRIEF:** R. Gary Winters, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellants. Tony C. Merry, LAW OFFICES OF TONY C. MERRY, LLC, Columbus, Ohio, for Appellee.

    McKEAGUE, J., delivered the opinion of the court, in which SUTTON, J., joined. JONKER, D. J. (pp. 15–19), delivered a separate concurring opinion.

---

[*] The Honorable Robert J. Jonker, United States District Judge for the Western District of Michigan, sitting by designation.

————————————

**OPINION**

————————————

McKEAGUE, Circuit Judge.  This appeal arises at the intersection of numerous areas of complex federal law.  We are called upon to sift through this complexity in the hopes of adding clarity.  For many years prior to this appeal, James Price received occupational disability benefit payments under an employee benefit plan established and maintained in accordance with the Employee Retirement Income Security Act of 1974 ("ERISA").  Price's benefits were discontinued after the trustees amended the plan to limit the payment of occupational disability benefits to a period of two years.  He then filed suit in federal district court, challenging the denial of his benefits and alleging that the plan amendment violated ERISA because his occupational disability benefits had vested as a matter of law.  The district court determined that Price's occupational disability benefits did indeed vest under this court's *Yard-Man* line of cases and, accordingly, found that the amendment as applied to Price violated ERISA.  The pension plan now appeals this determination, arguing that the benefits were not vested.  After considering all of the relevant bodies of law, we conclude that the district court failed to apply the appropriate standard of review when analyzing Price's claim.  Accordingly, we VACATE the district court's opinion and order and REMAND for further proceedings consistent with this opinion.

**I.**

The facts in this case are undisputed.  The Indiana State District Counsel of Laborers and Hod Carriers Pension Fund (the "Fund")  is a multi-employer employee benefit pension plan established and maintained in accordance with ERISA.  As required by ERISA, the Fund has a written pension plan document (the "Plan"), which sets forth the terms of the benefits provided by the Fund. The Plan indicates that Fund participants must be union employees, working under various collective bargaining agreements.  In addition, the Plan also provides that the Fund will be administered by a Board of

Trustees (the "Board").    The Board in turn possesses authority to make benefit determinations, interpret the Plan, and amend the Plan.    In granting the Board amendment power, Section 15.1 of the Plan specifically states:

> Any amendment to the Plan may be made retroactively by the majority action of the Board of Trustees present and voting in order to bring the Plan in compliance with the Act and any subsequent amendments thereto. It is the desire of the Board of Trustees to maintain the Plan as a qualified Plan and Trust under Code sections 401(a) and 501(a).
>
> The Trustees who are present and voting may amend the Plan by majority action.  However, no amendment shall be made which results in reduced benefits for any Participant whose rights have already become vested under the provisions of the Plan on the date the amendment is made, except upon the advice and counsel of an enrolled actuary.

James Price first began receiving disability benefits under the Plan in 1990, after a series of work-related injuries left him unable to work.  Price's benefits were initially approved under the Plan's "Total and Permanent Disability Benefit" category.  In 2001, the Fund notified Price that he no longer qualified for benefits under this category, but advised him that he could continue receiving benefits under Article 7A's provisions for "Occupational Disability Benefit."    At the time Price began receiving Occupational Disability Benefits, payment of those benefits was limited according to terms in set forth in Section 7A.5, which stated that "[t]he Occupational Disability Benefit shall be payable only during continued Occupational Disability and until Early Retirement Age under section 2.1(n)."  In 2004, the Board exercised its amendment authority under Plan Section 15.1 and amended Section 7.A5 (the "Amendment") to state the following:

> [T]he Occupational Disability Benefit shall be payable only during a Participant's continued Occupational Disability and—
>     *        *        *
> (b) effective for Occupational Disability Benefits commencing prior to January 1, 2005, for a period not to exceed December 31, 2006, or, if earlier, the Participant's attainment of Early Retirement Age . . . .

Because Price began receiving Occupational Disability Benefits prior to January 1, 2005, his benefits were discontinued after December 31, 2006, according to the Amendment.

Price appealed the discontinuation of his Occupational Disability Benefits to the Board, arguing that the Amendment as applied to him violated ERISA. The Board denied Price's appeal and stated in a written letter to Price's attorney that Occupational Disability Benefits could be amended under the terms of the Plan. Price then filed suit in federal district court under 29 U.S.C. § 1132(a)(1)(B). His complaint alleged that the Amendment violated ERISA because it deprived him of a benefit that had vested as a matter of law.

After a short period of discovery, the parties cross-filed for summary judgment. The district court granted judgment in favor of Price under this court's precedent in *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983). *Price v. Bd. of Trustees of the Ind. Laborer's Pension Fund, et al.*, 2:07-cv-00933 at 7 (S.D. Ohio Mar. 24, 2009). According to the lower court, Price's Occupational Disability Benefits vested under *Yard-Man* at the time he began receiving the benefits because the Plan promised benefits "until Early Retirement Age." *Id.* at 8. The district court read this provision as an indication that the parties intended the benefits to vest. *Id.* In separate orders, the lower court ordered the Fund to reinstate Price's benefits and pay Price's attorney's fees. The Board and the Fund bring this appeal, challenging the district court's determination that Price's Occupational Disability Benefits vested and its award of attorney's fees in favor of Price.

## II.

We review a district court's grant of summary judgment de novo. *Noe v. PolyOne Corp.*, 520 F.3d 548, 551 (6th Cir. 2008). "[S]ummary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56).

## III.

We begin by noting that disability benefits are a welfare-type benefit under ERISA, and as such, ERISA's statutory vesting requirements do not apply. *See* 29 U.S.C. § 1002(1); *Robinson v. Sheet Metal Workers' Nat'l Pension Fund, Plan A*, 515 F.3d 93, 98 (2d Cir. 2008). When a benefit is exempt from ERISA's vesting requirements, no barrier exists to the modification or discontinuation of the benefit. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). While ERISA does not require vesting, the parties may nevertheless provide for vesting of welfare benefits through agreement. *Schreiber*, 580 F.3d at 363. If the parties intended for the benefits to vest and this agreement is breached, an ERISA violation occurs. *Id.* Neither party in this case disputes that there is no express agreement providing for vesting of Price's Occupational Disability Benefits. Our inquiry does not end here, however, because while Price's benefits may not have vested under any express agreement, this court has long recognized that under certain circumstances an intent to vest can be inferred from specific language in the parties' agreements. *See, e.g.*, *Yard-Man*, 716 F.2d at 1482. When these circumstances are present such that the inference exists, the benefit vests in favor of the recipient. Accordingly, a unilateral decrease in these vested benefits would result in an ERISA violation. The question for this case then becomes whether the inference is present here.

To answer this question properly, we trace Sixth Circuit case law creating the inference that the parties intended for benefits to vest. The inference first appears in this court's seminal decision in *Yard-Man*; indeed, the inference has been renamed in many of our cases simply as the *"Yard-Man* inference." In creating the *Yard-Man* inference, this court addressed the specific question of "whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement [based] upon the intent of the parties." *Yard-Man*, 716 F.2d at 1479. To answer this question, we applied traditional rules of contract interpretation, consistent with federal labor law, and determined that the provision of the relevant collective bargaining agreement ("CBA"), which specifically provided for retiree benefits, was ambiguous as to whether the parties

intended the benefits to vest. *Id.* at 1480. Due to this ambiguity, we looked to extrinsic evidence, including durational provisions within the CBA and the context of the bargaining process, and determined that the parties did in fact intend for the retiree benefits to vest. *Id.* at 1480–83.

Subsequent to *Yard-Man*, this court has consistently applied its analysis to cases involving the issue of whether parties in the collective bargaining process intended for retiree benefits to vest according to the terms of the CBA. We have specifically inferred this intent that benefits vest where an ambiguity exists in the retiree benefits section of the CBA and where extrinsic evidence evinces the parties intention that the benefits vest. *See, e.g.*, *Noe*, 520 F.3d at 553 (finding intent to vest where CBA contained general durational clause, retiree benefits were tied to pension benefits, and promises in CBA would be illusory without vesting); *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 581 (6th Cir. 2006) (finding intent to vest could be inferred where CBA contained general durational clause); *Maurer v. Joy Techs. Inc.*, 212 F.3d 907, 917–18 (6th Cir. 2000) (finding intent to vest where durational clause of CBA was general rather than specific); *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999) (holding that district court should have considered terms of insurance agreement where CBA was ambiguous as to intent to vest). Price now seizes upon our reasoning in *Yard-Man* and its progeny and argues that the intent to vest can be inferred in this case.

Admittedly *Yard-Man* contains many similarities to this case, which would make its application attractive. Price's Occupational Disability Benefits are arguably similar in nature to the retiree health benefits at issue in *Yard-Man*. Additionally, the Plan in this case indicates that Price was a union member, working under a CBA. Yet before we plunge headlong—and perhaps haphazardly—into finding a *Yard-Man* inference here, we pause to consider whether *Yard-Man*'s framework is even workable with the facts present. In considering this issue, we note that principled distinctions exist between this case and the *Yard-Man* line of cases. After careful consideration, we

believe that these distinctions caution against applying *Yard-Man*'s set of rules in this context.

Chief among these distinctions is that, unlike in *Yard-Man*, where the benefit at issue was a retiree health benefit, the benefit at issue here is an occupational disability benefit. Our case law has not addressed whether the *Yard-Man* inference can be appropriately applied outside the context of retiree health benefits. This was a distinction that the district court apparently did not find significant. Instead, that court reasoned that "occupationally disabled" was a status similar to the"retiree" status because both are open to their benefits being negotiated away by future bargaining parties. *Price*, 2:07-cv-00933 at 6. We are not persuaded that the occupationally disabled status and retiree status can be quite so easily analogized. And we again believe that *Yard-Man*'s own language makes that case difficult to apply outside the context of retiree health benefits.

To begin with, the *Yard-Man* court specifically recognized a uniqueness in the retiree status because retiree benefits are considered a form of delayed compensation or reward for past compensation. 716 F.2d at 1482. Because these benefits are a form of delayed compensation, it is unlikely that the parties would leave them subject to future negotiations. Thus, the court may properly infer that the parties intended for retiree benefits to vest. *Id.* While this reasoning may hold true for retiree benefits, it resonates less in the context of disability benefits. Specifically, occupational disability benefits generally cannot be considered a form of delayed compensation. And, unlike retiree benefits where everyone meeting the length-of-service requirement will realize the benefit, only a small portion of those meeting the length-of-service requirement for occupational disability benefits will actually realize the benefit. Thus, rather than representing a form of delayed compensation, disability benefits are more appropriately characterized as an uncertain potentially realized benefit.

Moreover, *Yard-Man* notes a uniqueness in the retiree status because unions do not owe retired persons any obligation to bargain for their continued benefits. *Id.* Thus,

*Yard-Man* teaches, it is more likely that the parties would intend the retiree benefits to vest to avoid the benefits being left to future negotiations. *Id.* Unlike this feature of retiree status, the occupationally disabled status does not necessarily leave itself open to unrepresented future negotiations. This status is not as likely to be a permanent status, as is the case with the retiree status, because an occupationally disabled person might expect to recover at some point and return to a position of union representation. A more fundamental issue related to the occupationally disabled status is whether a person in this status is still considered an "employee" for the purpose of union bargaining. The record in this case is silent as to whether Price remained an employee for the purpose of union membership. However, it is likely that at least some persons in the occupationally disabled status would be employees—and union members—due to the requirements imposed by federal law. Specifically, the Family Medical Leave Act mandates that employers must provide an eligible employee with twelve workweeks of leave during a 12-month period if the leave is required due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). In addition, while the Americans with Disabilities Act does not require employers to grant a specified amount of leave to disabled employees, this act does require employers to reasonably accommodate disabled employees, unless the employer demonstrates undue hardship. 42 U.S.C. § 12112(b)(5)(A). Also, this court has specifically noted that an employer might be required to provide an extended leave period as part of a reasonable accommodation. *See Cleveland v. Fed. Express Corp.*, 83 F. App'x 74, 79 (6th Cir. 2003) (holding that a question of fact existed as to whether six month leave was a reasonable accommodation). Thus, it is possible that some disabled persons would never leave the confines of union bargaining. This possibility strongly cuts against applying the *Yard-Man* inference to this status.[1]

---

[1]Furthermore, we note that even if the *Yard-Man* framework was applicable to occupational disability benefits, Price has not produced any CBA upon which we can infer that the parties intended for his benefits to vest. To apply the *Yard-Man* inference in the absence of a CBA would require a court to assume—without any evidence confirming—that Price's Occupational Disability Benefits were provided for in the CBA. Moreover, our case law has consistently stated that the parties can establish a lack of intent to vest by including language within the CBA stating that the specific benefit would not survive the expiration of the CBA. *Noe*, 520 F.3d at 562. These so-called specific durational clauses allow the parties to overcome any inference that otherwise might exist regarding their intent for a benefit to vest. Applying

Our analysis leaves us convinced that *Yard-Man*'s framework cannot be applied here. Yet, our inquiry does not end there because the Board argues that in the absence of *Yard-Man*, we should apply this court's precedent in *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (en banc). In *Sprague*, we evaluated whether retiree health benefits vested in favor of salaried, non-union General Motors employees. *Id.* at 393. We ultimately held that when a benefit is unilaterally provided by an employer, the plan documents must contain a clear and express statement of intent to vest. *Id.* at 400. Because that language was lacking in *Sprague*, the benefits did not vest. *Id.* Applying *Sprague* to this case also presents an attractive solution. Yet for many of the reasons stated above, we do not believe that *Sprague* governs the outcome of this case either. The benefits at issue in *Sprague* were specifically characterized as unilaterally offered benefits. *Id.* at 393, 402-03. Here, however, the administrative record makes clear that Price's Occupational Disability Benefits were bargained-for and not unilaterally provided. Again, we are not convinced that the factual distinctions in this case can so easily be dismissed. Moreover, we believe that this case is properly understood under a different framework, one that does not include either *Yard-Man* or *Sprague*.

## IV.

If Price's Occupational Disability Benefits do not vest under ERISA's statutory vesting requirements and the *Yard-Man* and *Sprague* frameworks are inapplicable, then the only possible source for vesting of Price's benefits is the Plan itself. Section 15.1 of the Plan clearly gives the Board authority to amend the Plan. Yet it also specifically prohibits any amendment "which results in reduced benefits for any Participant whose rights have already become vested under the provisions of the Plan on the date the amendment is made, except upon the advice and counsel of an enrolled actuary." The

the *Yard-Man* inference to this case, without the benefit of consulting the relevant CBA, might inadvertently thwart the parties' intent to specifically prevent the vesting of Occupational Disability Benefits. At minimum, this application of *Yard-Man* would undercut future parties' ability to prevent vesting through specific durational clauses, which would undermine *Yard-Man*'s carefully balanced reasoning.

issue then becomes whether Price's Occupational Disability Benefits became vested within the meaning of the Plan such that the Amendment could not be applied to him.

At the outset, we pause to determine whether the Board's decision denying Price's appeal should be given any deference. The answer to this question lies in how the issue is framed. The district court reviewed the Board's decision de novo by framing the issue as whether the "Plan Amendment violate[d] ERISA." *Price*, 2:07-cv-00933 at 3. Yet we have already determined that neither ERISA nor *Yard-Man* provide for vesting in this case. Moreover, Price's own complaint, filed following an appeal of the denial of his Occupational Disability Benefits, was brought under 29 U.S.C. § 1132(a)(1)(B), which allows for civil actions "to recover benefits due to [a claimant] under the *terms* of his plan." When the issue is properly framed as whether Price's Occupational Disability Benefits vested under the terms of this Plan, then de novo review seems less appropriate. Rather, the standard for reviewing an administrator's determination on an individual's claim for benefits seems most appropriate.

When an ERISA benefits plan gives the administrator discretion in interpreting its terms or making benefits determinations, both this court and the district court review the administrator's decision under the arbitrary and capricious standard. *See Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 328 (6th Cir. 2009) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–15 (1989)); *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 659–60 (6th Cir. 2004); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998). Under this standard of review, "we must uphold the administrator's decision if the administrator's interpretation of the Plan's provisions is reasonable." *Kovach*, 587 F.3d at 328 (alteration and internal quotation marks omitted). While federal case law has created confusion on the applicable standard of review applicable to cases involving vesting of welfare benefits, court-fashioned common-law principles for interpreting ERISA welfare plans "are properly understood as aids to determining whether the denial of benefits by the administrator is reasonable, rather than as warrants for a court's resolving interpretive disputes without any deference to the administrator's

exercise of interpretive discretion." *Marrs v. Motorola Inc.*, 577 F.3d 783, 786–87 (7th Cir. 2009).

Applying these mandates here, we conclude that, if the Plan gives the Board discretion to interpret its terms, the essence of this case turns on the reasonableness of the Board's decision. And, indeed, the Plan does give such discretion, and that discretion was invoked by the Board in terminating Price's benefits. Section 11.9 provides that "[t]he Board of Trustees shall have the exclusive right and discretion to interpret the terms and provisions of the Plan . . . ." Therefore, the Board's decision must be reviewed under the arbitrary and capricious standard of review, using common-law principles as aids in undertaking this review, and looking to the terms of the Plan to determine whether or not the Board's interpretation was reasonable. *See Marrs*, 577 F.3d at 786–87.

We pause briefly to note that, while agreeing that the arbitrary and capricious standard applies to review of Price's claim, our concurring colleague nonetheless suggests that Price's disability benefits became vested at the time they were awarded, regardless of the use of the terms of the Plan or any intent inferred therefrom. In fact, our concurring colleague states that the subsequent amendment to the plan had "no proper impact at all" on Price's receipt of benefits. The concurrence claims that when the Plan found Price eligible for disability benefits, it effectively issued an "IOU" that was "a single and discrete event that was complete at the time the Plan made the award decision." Yet, our colleague provides no support for such assertions, either from the Plan itself or from the controlling statutory or case law.[2] Contrary to the claims in the concurrence, review of the Board's decision necessarily entails looking to the terms of

---

[2]The Second Circuit has held that where an employee benefits plan provides for disability benefits, those benefits vest "no later than the time that the employee becomes disabled." *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1212 (2d Cir. 2002). Yet, in both *Feifer* and in *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571 (2d Cir. 2006), where that same principle also was applied, the welfare benefits plans at issue did not contain explicit language reserving the right to amend or revoke the challenged benefits, while the Plan at issue here does. *See Gibbs*, 440 F.3d at 577; *Feifer*, 306 F.3d at 1211. In fact, in *Gibbs*, the plan contained a provision expressly stating that "[a]ny modification or termination will not affect [the employee's] right to benefits from a covered disability that occurred before the termination or modification." 440 F.3d at 577. Thus, these cases are distinguishable from Price's case, and the Second Circuit's holding does not alter the outcome here.

the Plan to determine if Price's disability benefits vested, as it is the Plan itself that sets forth the terms by which benefits are conferred, vested, or terminated.[3]

In reviewing the terms of the Plan, it would be tempting to find that the language of the Plan indicates an intent to vest because the Plan provides that amendments may not reduce benefits that have become "vested" in Section 15.1. However, an analysis of the context in which the word is used shows that it applies to retiree benefits and not disability benefits. Article 7A, which governs Occupational Disability Benefits, does not use the term vested or accrued to refer to or to modify the term "Occupational Disability Benefit." Nor does it provide any other vesting provisions for disability benefits. Thus, one must look to other sections of the Plan for a definition of vesting, since the Plan does not expressly provide one. The closest the Plan gets to a definition of "vesting" is Section 9.2, titled "Vesting Schedule,"which states that "[a] participant who begins benefit payments on or after June 1, 1997 shall be vested in his Accrued Benefit . . . ." This section then points to the term "Accrued Benefit," which is defined in Section 2.1(a) as "the monthly benefit that has been earned by a Participant for the years of Service he worked for an Employer according to the benefit formula described in section 4.2 hereof." Moving to Section 4.2, which is titled "Amount of Normal Retirement Benefit," this section provides a detailed formula for calculating a participant's monthly "Normal Retirement Benefit." Specifically, Normal Retirement Benefits are calculated using the sum of a participant's "Past Credited Service Benefit" and his "Future Credited Service Benefit." The Future Credited Service Benefit provision provides differing formulations depending on the participant's retirement date, and the Past Credited Service Benefit specifically references the "retired status."

---

[3]For example, the Plan requires that anyone seeking receipt of Occupational Disability Benefits must have at least ten years of service at the time of his disability. The Plan also requires that the recipient provide a copy of any federal income tax form reporting income earned from supplemental employment in order to continue receiving benefits. Most importantly, the Plan explains that benefits may be terminated for a number of reasons, including if the recipient's annual income from supplemental employment exceeds 150 percent of his annual occupational disability benefit, if the recipient fails to provide the Board of Trustees evidence of income from supplemental employment, or if the recipient refuses to undergo a medical examination as requested by the Board of Trustees. Accordingly, though our colleague in the concurrence suggests that the terms of the Plan become irrelevant at the moment an individual first receives disability benefits, in fact, it is the very terms of the Plan that determine the ways that such benefits can be terminated even after they have already been provided to a recipient.

Reading all of these provisions together, it would not seem unreasonable for the Board to determine that Price's Occupational Disability Benefits were not "Accrued Benefits" and therefore did not vest. As noted above, Article 7A, which covers Occupational Disability Benefits, does not contain specific vesting language. Nor do Sections 9.2, 2.1(a), or 4.2 contain language including the Occupational Disability Benefit within the meaning of "vested" or "Accrued Benefit." Instead, Section 4.2 specifically refers to the "retired status" and provides amounts based on retirement dates.[4]

Price nevertheless argues that his benefits vested under Section 7A.2 because that section provides that "[t]he Occupational Disability Benefit shall be a monthly benefit equal to 65 percent of the Participant's vested Accrued Benefit, unreduced for early payment." Although Price's alternate interpretation of Section 7A.2 could be plausible, that would not render the Board's interpretation unreasonable. Further, Price's interpretation does not seem to be the most logical reading of that section. The term "vested" modifies the phrase "Accrued Benefit," and the definition of Accrued Benefit in Sections 2.1(a) and 4.2 does not contain any language indicating that Occupational Disability Benefits are Accrued Benefits. To adopt Price's reading of Section 7A.2 would seemingly rewrite that section to state that "the *vested* Occupational Disability Benefit . . ." or would insert the term "Occupational Disability Benefit" within the definition of Accrued Benefit. A more logical reading of Section 7A.2 would seem to be that rather than providing a vested right to Occupational Disability Benefits, Section 7A.2 merely provides a formula for calculating the benefit amount.

---

[4]We pause to note that, despite the assertion made by our colleague in the concurrence, we do not suggest that the difference between pension benefits and welfare benefits alone justifies the Board's decision to revoke Price's Occupational Disability Benefits. As we explained above, the difference between pension and welfare benefits does compel our conclusion that *Yard-Man* cannot be applied to this case. However, whether the Board properly decided to terminate Price's disability benefits requires a review of the Board's interpretation of the terms of the Plan as applied to Price, and whether such interpretation was arbitrary and capricious. Thus, our discussion of the reasonableness of the Board's decision focuses on the Plan's use of the term "vest" in relation to the use of the terms "Occupational Disability Benefit," "Retirement Benefit," and "Accrued Benefit," and not, as the concurrence suggests, on the difference between those benefits.

The district court, however, did not review the Board's determination under the arbitrary and capricious standard, and neither party addressed the issue using the proper standard of review in the district court or before this court. Accordingly, we believe that the matter must be remanded to the district court. There, the parties will have the opportunity to brief the issue with the correct standard in mind and the district court may properly review the Board's decision regarding the interpretation of the terms of the Plan and the resulting termination of Price's benefits using the arbitrary and capricious standard.[5] Additionally, because we vacate the district court's judgment in favor of Price, the award of attorney's fees in favor of Price is no longer appropriate. *See Sec'y of Dep't of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985) (stating the factors for determining fee awards in ERISA cases). Accordingly, we vacate this decision as well.

## V.

For the foregoing reasons, we VACATE the decision of the district court and REMAND for further proceedings consistent with this opinion.

---

[5] Although we have undertaken a brief and cursory review of the terms of the Plan and its use of the term "vest," we do not intend to prejudge the outcome of this case on remand under the arbitrary and capricious standard. Rather, we do so both in response to the arguments raised by Price in his brief and, in light of the alternative framework proposed by the concurrence, to provide a clear and appropriate starting point from which the district court may engage in its own analysis on remand.

———————————

**CONCURRENCE**

———————————

JONKER, District Judge, CONCURRING.  I agree fully with the lead opinion's analysis and conclusion that *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998), rather than *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard-Man Inc.*, 716 F.2d 1476 (6th Cir. 1983), establishes the appropriate framework of review here, and I have no objection to remanding the case to the District Court for application of the *Wilkins* framework in the first instance.  I do not believe a remand is necessary, however, because in my view a change in the framework of review does not alter the correct outcome in the case.  I would readily vote to affirm the District Court's original decision now under the *Wilkins* standard.

The key insight of the District Court, and the practical hinge of its decision, was recognition that this case involves a decision to terminate already awarded benefits, not a decision to grant or deny benefits in the first instance.  In my view, this is a critical difference.  Everyone agrees Mr. Price originally qualified for and received an award of complete disability benefits in 1990.  At that time the Plan by its terms promised to pay the benefit all the way to early retirement age, as long as the qualifying participant remained disabled.  Everyone further agrees that Mr. Price later qualified for and received an award of the Plan's occupational disability benefit in 2001.  At that time the Plan by its terms promised to pay this benefit all the way to early retirement age, as long as the qualifying participant remained disabled.  And everyone agrees that Mr. Price remains disabled to this very day.  Even so, the Plan stopped paying Mr. Price the promised disability benefit on January 1, 2007, not because he reached early retirement age, and not because his disability status changed, but solely because the Plan adopted an amendment after Mr. Price's award that cut the occupational benefit off effective December 31, 2006.  Of course the amendment applies by its terms to anyone who first qualifies for the benefit after the date of the amendment; the Plan had no obligation to continue to offer the same package of welfare benefits to potential beneficiaries that it

had previously offered. But for someone like Mr. Price, whose disability benefit was first awarded by the Plan before the amendment, when the Plan promised to pay the benefit until the later of early retirement age or the end of disability status, I believe the amendment has no proper impact at all.

What happens when the Plan awards a disability benefit to a qualified participant like Mr. Price? In my view, when the Plan initially decides that a participant qualifies – that the participant has worked the required ten years, has demonstrated disability status and has otherwise satisfied the requirements for coverage – and awards the disability benefit, something fundamentally changes: the Plan's disability benefit package generically offered to all qualifying participants confers enforceable contractual rights and obligations on the Plan and on the particular qualifying participant. Those contract rights and obligations, in my view, are defined by the terms of the Plan in effect at the time of the initial qualification decision. It is as though the Plan effectively issues the participant a benefit package IOU promising to pay the terms of the benefit in effect at the time of qualification. In the case of Mr. Price, the benefit package promised payment until the later of early retirement age or the end of disability status. The Plan remained free to require Mr. Price to demonstrate his continuing disability status from time to time, because the Plan terms said so at the time Mr. Price originally qualified. But each such review was not a new decision to award benefits; rather, it was a simple implementation of the terms of the benefit package conferred upon Mr. Price in the first instance. The decision to award the benefit package was a single and discrete event that was complete at the time the Plan made the award decision, and that conferred enforceable contract rights and obligations on each party.

The lead opinion is quite correct to observe that I have cited no case or statute that describes or applies the disability benefit award in the terms I have just used. It is, I believe, equally correct to observe that the lead opinion cites no authority that applies the general rules upon which we all agree to the particular fact pattern we have here. In my view, citations to a particular case or statute cannot settle the precise dispute here because there is no such authority, at least none that the parties have cited or that our

independent research has uncovered. It is the apparent dearth of on point authority that leads to my effort to articulate for the first time a framework of analysis that is both faithful to the agreed general rules and at the same time respectful of what I believe are the real, reasonable and enforceable contractual expectations of the parties.

The framework I am advocating has the salutary practical effect of treating this case, which provides disability benefits through a trust fund created under a collective bargaining agreement, in the same way federal courts routinely treat ERISA disability cases involving benefits provided through a private insurance contract. Such cases are a staple of the federal district court docket. I know of no such case in which any party or the court has suggested that a change in disability benefits offered by the employer's disability Plan reaches back to change the terms of a previously awarded disability benefit under the terms of the Plan, and the insurance policy funding the Plan, in effect at the time of the initial award. The parties and the courts appear to assume – properly in my view – that the governing terms of the disability award are the ones in effect at the time of the original award. In my view, a union employee like Mr. Price, whose disability benefit is funded by a Trust created under a collective bargaining agreement, rather than by a private insurance contract, reasonably expects nothing less:  the terms of the Plan in effect at the time of the initial benefit award should define the contractual rights and obligations of the parties.

Using the terms of the Plan in effect at the time a participant qualifies for the initial disability award also works with the other welfare benefit funded through the Trust in this case. The Plan at issue here provides for not only pension and disability benefits, but also a death benefit. A death benefit, like a disability benefit, is a welfare benefit under ERISA and therefore subject to the general rule against vesting of welfare benefits. Suppose a covered and qualified employee dies and triggers the death benefit. Does the Plan have the lawful power to amend the terms of the death benefit after the employee's death in a way that would prevent payment of the benefit? Under the lead opinion's analysis, it would seem the Plan could do so because the amendment would allow the Plan to deny what had been in place on the original qualifying date. In my

view, the Plan would be obligated to pay the death benefit if the terms of the Plan in effect on the qualifying date – the date of death – required it. Once again, I believe that result is consistent with both the agreed general rules governing ERISA welfare benefits, and the reasonable contractual expectations of the parties.

Finally, if the lead opinion's view of the disability benefit prevails, then I would submit that union employees whose disability benefit is protected only by a Trust like the one here had better purchase their own private disability insurance policy, too, because they really do not have meaningful disability protection. I say that, because once a person is disabled, they are by definition not able to engage in income-generating work, or at least not income-generating work of the kind they are accustomed to performing. Nor, obviously, are they able to purchase private disability insurance after they are already disabled. If the Trust obligated to fund their promised disability benefit also has the power to amend the Plan after the qualifying disability event in a way that cuts off the benefit even for people who have already qualified, then there is really no reliable disability protection at all. Mr. Price, of course, is in exactly that position if the lead opinion's view of the Plan's power prevails.

The lead opinion suggests that the well-established difference under ERISA between pension benefits, on the one hand, and welfare benefits – including disability benefits – on the other hand, may justify the Plan's decision here to revoke the disability benefit package it originally awarded to Mr. Price. I respectfully disagree with that because in my view it overlooks a critical difference between the Plan's undeniable power to change the terms of a generally applicable welfare benefit – including a disability benefit – prospectively for people who have not qualified for the benefit, on the one hand; and the Plan's quite different claim to have the unilateral power to change or even eliminate disability benefit packages it has already awarded. I see nothing in the ERISA welfare benefit cases, including those dealing with retiree health care benefits, that suggests the Plan's undisputed power to make prospective changes in available benefit packages not yet awarded includes the power to unilaterally change or eliminate a benefit already conferred. A disability benefit award is not a recurring annual

decision; rather, it is a one time decision to grant or deny the benefit package followed by ongoing administration – including periodic review of disability status – of any package awarded.

For this reason, I do not believe it is even necessary to reach the reasonably possible constructions of the amendment provision of the Plan. I simply do not believe it applies by its terms to this unique situation. The provision permits amendments to the benefits offered by the Plan, but this in my view is not the same thing as changing or eliminating a particular benefit already conferred. Nothing in the Plan language purports to permit a retroactive change to the contractual terms of a benefit already conferred. Once the Plan awarded Mr. Price the disability benefit, I believe the Plan was contractually obligated to pay the benefit by the terms as defined on the date of the award. And in this case these terms did not permit the Plan to cut off benefits before Mr. Price reached early retirement age as long as he remained disabled, as all agree he is to this very day.

Accordingly, I would readily vote to affirm the District Court now, but I do not object to a remand to give the District Court the first opportunity to apply the *Wilkins* standard to this record, or to any expanded record the District Court may find proper.